# Richmond

## W. A. MOOERS v. NORWOOD WILSON, EDITH N. WILSON AND H. D. EICHELBERGER.

April 23, 1945.

Record No. 2906.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*George B. White,* for the appellant.

*Archer L. Jones, F. L. Wyche* and *William Earle White,* for the appellees.

GREGORY, J., delivered the opinion of the court.

This appeal brings in question a decree entered by the circuit court denying the appellant, who was the complainant below, specific performance of an alleged contract for the sale and purchase of a valuable farm known as "Maycox", on the James river, owned at the time by the appellee, Norwood Wilson.

There was no formal written contract entered into between the parties. The alleged contract of sale was verbal but it is claimed that it was confirmed in writing by certain correspondence had between Wilson, the owner, and his agent, W. R. Jenkins.

In 1941 the farm was listed for sale by Wilson with H. T. Richeson and Company, a reputable real estate firm located in Richmond, Virginia. In the early part of 1943, W. R. Jenkins, one of the salesmen for the real estate firm learned that W. A. Mooers was interested in the purchase of a farm on the James river. He called on Mooers and arrange d to show him several farms on the James river, including "Maycox". After seeing "Maycox" and making a careful inspection of it, Mooers decided that it was suitable for his purposes, and he thereupon entered into negotiations with Wilson's agent for its purchase.

On May 10, 1943, Wilson wrote direct to his agent, in part, as follows:

"Concerning your further inquiry about Maycox plantation, I am enclosing a historical sketch in addition to the map and soil conservation study that I have already loaned you, which, however, are to be returned. In regard to a firm price until June 1, 1943, I am a little hesitant for several reasons, however, as I promised, the price of $15,000 will be good until that time. * * * "

On May 18, 1943, Mooers, through the agent, made Wilson a written offer of $13,500 for the farm. Wilson told the agent he would not take less than $15,000, and that he, Wilson, was going to help the agent make the sale by including certain personal property on the farm. Following up this proposal, on the evening of May 19, 1943, Wilson called on Jenkins and handed him a letter bearing

date May 19, 1943, setting out specifically the personal property to be included in the sale of the farm. He affixed a value to each item, which amounted, in the aggregate, to $880. And at this time he and Jenkins agreed that the commission on the sale which ordinarily would have been $1,500 would be reduced to $1,000.

On May 20, 1943, the following day, Jenkins telephoned Mooers that Wilson had given him a letter containing a list of the items of personal property that he would include in the sale of the farm. Thereupon Mooers went to the office of the agent and examined the list and instructed the agent to offer Wilson $15,000 in cash if Wilson would also include one double spring tooth harrow, one No. 66 Chattanooga plow, one wheelbarrow grass seeder, one double wagon, one John Deere manure spreader, one John Deere two-horse mower, one U. S. corn husker, one shredder, and one double action tractor disc. The agent got in communication with Wilson on the telephone, who was at that time at Hopewell, Virginia, and advised him of the new offer. Mooers listened to the conversation on an extension telephone in the agent's office. Wilson told Jenkins that he could not include the manure spreader, and that the Chattanooga plow was not his. Thereupon Jenkins asked Mooers "what about it". Mooers said "all right, I will take it". Then Jenkins said to Wilson "all right", and Wilson said "sold". Jenkins then told Wilson to write him a letter confirming the sale. Thus a verbal agreement was made between the parties which was confirmed by the following letter of May 20, 1943, addressed to Jenkins and signed by Wilson:

"Referring further to our telephone conversation of today with particular reference to letter of May 19th. I understand that you are holding pending delivery of proper title a check for $1000.00 which is to be forfeited to the writer should the balance of the purchase price of Maycox plantation, namely, $14,000.00 cash, that is $15,000.00 total, not be paid when proper title is presented to your prospective purchaser. In addition to conveyance of the real estate, the

writer will give a bill of sale covering the items referred to in letter of May 19th, as items that are normally used on the farm detailed in the second paragraph of the letter referred to, and in addition will include in this bill of sale the following:

> "1 double spring tooth harrow
> 1 wheelbarrow grass seeder
> 1 double wagon
> 1 John Deere two horse mower
> 1 U. S. corn husker and shredder
> 1 grade Guernsey milk cow

"All other items of personal property to be removed by the writer.

"I am enclosing sketch of an old plat of Maycox which might be of interest to Mr. Mooers. I understand that you will be ready to close this sale paying to the writer $15,000.00 in cash any day on and after May 24th, but before May 31st, 1943."

On the same day Wilson wrote Jenkins another letter which had reference to the reduction in the agent's commission from $1,500 to $1,000. That letter is as follows:

"I have not referred to any commission in previous letters, but upon consummation of this sale whereby the writer receives $15,000.00 in cash, you are to be paid a commission of $1000.00. After the necessity of adding the additional machinery, which, on a second hand market, would no doubt be valued at approximately $500.00, the reduction that you would take in your commission in accordance with our conversation, would exceed $500.00, and for this reason, I have set forth the commission as $1000.00 which is in accordance with our understanding."

Later on the same day the agent prepared a formal written contract for the sale and, through mistake, dated it May 18, 1943, instead of May 20, 1943. Mooers signed this contract. Copies were sent to Wilson but he did not sign them. Mooers had already deposited with the agent $1,000 as

evidence of his good faith, and in accordance with one of the letters of May 20th, the $1,000 was to be forfeited in the event Mooers failed to pay the balance of $14,000 in cash as agreed.

Mooers employed Mr. Baker, an attorney, to examine the title to Maycox. He applied to Wilson at Hopewell, Virginia, for information regarding the title. Wilson told him he did not have an abstract, and said "if you have any trouble with it let me know".

Upon receipt of the report on the title Mooers called upon the agent to make settlement. Thereupon, on May 27, 1943, the agent sent Wilson the following letter by registered mail:

"Mr. W. A. Mooers called at our office today to make settlement for the property which he purchased from you known as "Maycock's Plantation" in Prince George County, as per agreement.

"Please let us have the deed properly executed, conveying the property to:

"'Willard A. Mooers and Ruth McDowell Mooers', (husband and wife) as tenants by the entireties with the right of survivorship as at common law.

"As soon as this deed is received, we will immediately have Mr. Mooers to give us his check and make remittance to you. Of course, it will be necessary that the outstanding liens be released in order that Mr. Mooers may be furnished with a title to the property free of any liens, and, also a release of the lease to the Maycock Hunting Club, which is recorded in Deed Book 114, page 218, in the Clerk's office of Prince George County Circuit Court. According to the memorandum we have from the title examiner, this lease should have expired some time this year, unless some arrangements have been made with you for renewal. You can let us know about this."

Wilson did not answer this letter, and Jenkins reported the matter to Mr. Richeson, the president of the real estate firm, whereupon Richeson, Mooers, and Jenkins, went to Hopewell to confer with Wilson. Wilson suggested several

incidental matters that had to be straightened out before the deal could be closed. It appeared that Chapin and Clark had the exclusive sale of the farm and that they would claim commission in event the sale went through to Mooers. Whereupon, Mooers and Richeson agreed to satisfy Chapin and Clark, which they did. Wilson was notified by telegram that the Chapin and Clark claim had been adjusted, to which he made no reply.

The agent again wrote Wilson on June 5, 1943, calling on him to settle the transaction. Wilson made no reply to this letter, but on June 11, 1943, Wilson and his wife conveyed Maycox to H. D. Eichelberger. The deed was recorded on the same day.

The appellant contends that Eichelberger had actual knowledge of the fact that he had purchased Maycox before Eichelberger secured his deed. From our view of the case we need not consider this contention.

The decisive question to be resolved is whether or not Wilson and the appellant entered into an enforceable contract in equity.

After the complainant had introduced all of his evidence, which was taken *ore tenus* in the court below, the respondent moved to strike it on the ground that there was no proof of a valid and enforceable contract between the parties. The court sustained the motion, struck the evidence, and entered a decree dismissing the bill of complaint.

This court, so far as we are informed, has never had before it procedure of this kind in a chancery suit. For the purposes of a decision of this cause in this court the action of the court below on the motion to strike the evidence upon the record before us will be considered a determination of the cause upon the merits. For, in final analysis, the effect of sustaining the motion to strike the evidence was a holding by the court that upon it, as a matter of law, the complainant had no case. Upon this appeal no actual question is presented, the only question presented is whether, as a matter of law, the evidence makes out a case.

The contract sought to be enforced grows out of the

letters of Wilson, which were signed by him, and which he does not challenge in his answer. Whether they are sufficient to bind him is a law question and not one of fact.

The record, in our opinion, discloses that a valid contract enforceable in equity against Wilson was created by the correspondence which would have become mutual and binding upon the appellant if he had made an unqualified acceptance. However, instead, when he filed his bill of complaint, he made this additional term in this allegation in his bill:

"Your complainant states that he is advised and believes the defendant, Edith N. Wilson, is the wife of the said defendant, Norwood Wilson, and as such has a contingent right of dower in said land, but your complainant is not advised whether the said Edith N. Wilson is willing to dispose of her said right by uniting in a deed from her said husband, Norwood Wilson, to your complainant, however, in the event she is not willing to do so, should not in equity and good conscience excuse the said Norwood Wilson from conveying said land, subject to the rights, if any, of the said Edith N. Wilson, the value, if any, of said rights, to be deducted from the purchase price of the said land".

It is vigorously contended that because of the foregoing allegation it was made apparent that the essential mutuality that every enforceable contract for the sale of real estate must possess was absent. The appellant asked the court below to allow him to amend his bill by striking out the allegation. This request was made just before the introduction of evidence began. Counsel for the defendant objected to the amendment, and the court sustained the objection. The court was of the opinion that to have allowed the amendment would have been equivalent to making a new contract; that it would have been equivalent to offering to take the property upon different terms from those agreed upon in the contract which had been alleged to have arisen by the correspondence, and that for this reason the parties had never reached a final agreement as to the terms.

It was necessary that Wilson's obligation to be bound be in writing, for he was the person to be charged thereby. Mooers would have become bound when he instituted his suit for the specific performance of the contract, but for his claim in the bill to an abatement of the purchase price. *Central Land Co.* v. *Johnston*, 95 Va. 223, 28 S. E. 175.

"A contract may be unilateral but when suit is brought for its enforcement he who has not theretofore been bound will be deemed to have consented to it in writing and to have made the obligations mutual". *Boston* v. *Shackelford*, 162 Va. 733, 175 S. E. 625.

Therefore, it is correct to state that the contract would have become mutual and binding upon Mooers if he had alleged that particular contract upon which they had agreed and which was confirmed by Wilson's letter of May 20th. However, Mooers did not allege in his bill of complaint that particular contract, but instead he alleged quite a different one. The difference is made perfectly manifest by reading the allegation quoted above and comparing it with the agreement between them. From that allegation Mooers was not willing to pay the agreed purchase price of $15,000. The allegation discloses that he was willing to pay a lesser amount, that is, $15,000 less the value of the contingent dower rights of Mrs. Wilson. She not having been a party to the contract, of course, was not bound to convey her dower rights to Mooers.

A court of equity, in the absence of fraud, will not, at the instance of a vendee, decree the specific performance of a husband's contract to sell his land in which his wife has a contingent right of dower, which she refuses to release, where the purchaser *demands an abatement* of the purchase price on account of such refusal. *Haden* v. *Falls*, 115 Va. 779, 80 S. E. 576.

Undoubtedly specific performance will be decreed against a vendor where the vendee is willing to accept a deed from the vendor without the vendor's wife relinquishing her right of dower and *asks no abatement* in the purchase

price. *Ford* v. *Street*, 129 Va. 437, 106 S. E. 379; *Steadman* v. *Handy*, 102 Va. 382, 46 S. E. 380.

The reason for the rule is clearly set forth in *Haden* v. *Falls, supra.* It is also succinctly stated in Minor on Real Property, 2nd Ed., Vol. 1, pages 382-383, in these words:

"The view in Virginia, apart from the statute declaring the joinder of the wife in the husband's contract to convey to constitute a release of her dower, is that the husband cannot be compelled to convey at all in such case, unless the purchaser is willing to pay the full purchase price, deducting nothing on account of the failure of the wife to release her dower. Two main reasons for this rule have been suggested. To cause the husband to convey at a reduced price would itself tend to exert pressure on the wife and it might well induce the husband to seek to compel the wife to join with him to the injury of domestic concord. Further, it is extremely difficult to value properly an inchoate dower right because of the contingencies involved. Thus, to allow the purchaser an abatement of the purchase price equivalent to what was conceived to be the value of the contingent dower would be in effect granting specific performance of a contract which the parties had not made".

It is true the defendants did not demur to the complainant's bill on the ground that he sought an abatement in the purchase price and they did not raise this defense in their answers. However, in such cases, it is not necessary to make the defense in that manner as is clearly shown from the following pertinent quotation from *Haden* v. *Falls, supra*:

"There is neither allegation nor proof that Mrs. Falls' refusal to unite in the conveyance signed by her husband was procured by his fraud. It is true in this case, as in the case of *Clark* v. *Reins, supra* [12 Gratt. (53 Va.) 98], that no objection was made in the answers of any of the defendants to the specific execution of the husband's contract on the score of the coverture of the wife of the vendor, nor was that objection urged in argument here; but as the denial of a court of equity to specifically execute a husband's contract

for the sale of land in which his wife has an interest, where she refuses to join in the conveyance, unless the purchaser is willing to pay the full purchase price, claiming neither an abatement thereof nor indemnity on that account, is based upon principles of public policy, the fact that the objection was not made in the answers would not seem to be material".

Finally, the appellant urges that he should have been allowed to amend his bill eliminating therefrom the allegation relating to the abatement of the purchase price. It is quite true that ordinarily amendments are liberally allowed, but here it was not so much a question of the right to amend as it was the right to change a very material term of the contract which had been alleged in the bill of complaint. Wilson had made himself liable by his letters to convey the farm to Mooers for $15,000, no less. The act which the law provides shall be an acceptance so far as Mooers is concerned, in a situation of this kind, was the institution by Mooers of his suit against Wilson for the specific performance of that contract. The acceptance thus made by Mooers of the offer of Wilson was bound to be within the terms of the offer in order to be valid. But, as we have seen, Mooers, in his bill, did not accept the offer as tendered, but engrafted a new term, to-wit, the abatement in the purchase price equal to the value of the inchoate right of dower of Mrs. Wilson. This, then was not within the terms of Wilson's offer. He had never agreed to take less than $15,000. Obviously it follows that there never was a meeting of minds on this important term. In this condition of affairs it would have been improper for the court to have allowed Mooers, by amendment, to change his position.

For these reasons we think the decree should be affirmed.

*Affirmed.*