# Richmond

## FRANK S. RICHESON, ET AL. V. NORWOOD WILSON.

April 26, 1948.

Record No. 3320.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley
and Miller, JJ.

The opinion states the case.

*George B. White*, for the plaintiffs in error.

*Jones & Jones*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

This is a companion case to *Mooers* v. *Wilson*, 183 Va. 910, 33 S. E. (2d) 791, in which we affirmed a decree of the Circuit Court of Prince George county denying specific performance of an alleged contract, under the terms of which it was claimed that Norwood Wilson had agreed to sell to W. A. Mooers a valuable farm, known as "Maycox," located in Prince George county, Virginia.

The present suit is an action for commissions brought by Frank S. Richeson and others, partners trading as H. T. Richeson & Company, against Wilson for services rendered in negotiating the alleged sale of the property by Wilson to Mooers.

While the factual background in the two suits is the same, there are important differences in the evidence. The chancery cause of *Mooers* v. *Wilson, supra,* was submitted and a decree rendered on the evidence offered by the complainant, Mooers. Wilson did not testify or offer any evidence on his behalf.

In the present suit a jury was waived, the evidence was heard *ore tenus* by the trial court and was fully developed by both sides. Upon consideration thereof the trial court rendered judgment, denying the claim for commissions, and the matter is before us on a writ of error granted the brokers.

As settled by the trial court's finding, the evidence may be stated thus:

Some time in the year 1940, W. R. Jenkins, a salesman for H. T. Richeson & Company, a reputable real-estate firm located in Richmond, inquired of Wilson whether the farm was for sale. Wilson advised him that it was, but declined to list it with Jenkins' firm, or to authorize him to sell it. From time to time Jenkins made the same inquiry of Wilson and received the same reply.

In May, 1943, Jenkins again approached Wilson, telling the latter that he had a prospective purchaser for the farm. Wilson replied that the farm was for sale if a satisfactory price could be obtained. Jenkins advised Wilson that his customer might pay $10,000 for the property, but Wilson refused to consider this price.

On May 18, Jenkins submitted to Wilson a written offer from W. A. Mooers to buy the property at $13,500, which Wilson declined. Then followed several offers and counter-offers, in which there were detailed certain items of farm equipment, livestock, etc., which should be included in the purchase price of the property. Finally, on May 20, there

was a telephone conversation between Jenkins and Wilson in which these details were tentatively agreed upon. Jenkins died before the trial of the present case, but Mooers had listened to the conversation on a telephone extension line in Jenkins' office and testified briefly as to what was said.

Mooers testified that after they had agreed in this telephone conversation what machinery, equipment, etc., should be sold with the farm, Wilson said "it is a deal."

Wilson categorically denied having used this expression, or any other which indicated that the transaction was closed. He said that he merely outlined to Jenkins the terms upon which he would sell the property. The finding of the trial court, of course, settled this conflict in Wilson's favor.

On the same day (May 20), Wilson wrote Jenkins two letters. In the first he said:

"Referring further to our telephone conversation of today with particular reference to letter of May 19th, I understand that you are holding pending delivery of proper title a check for $1,000 which is to be forfeited to the writer should the balance of the purchase price on Maycox Plantation, namely, $14,000 cash, that is $15,000 total, not be paid when proper title is presented to your prospective purchaser. In addition to conveyance of the real estate, the writer will give a bill of sale covering the items referred to in letter of May 19th * * * . (Here follows a list of items of farm equipment, livestock, etc.)

"All other items of personal property to be removed by the writer.

"I am enclosing sketch of an old plat of Maycox which might be of interest to Mr. Mooers. I understand that you will be ready to close this sale, paying to the writer $15,000 in cash any day on and after May 24th, but before May 31st, 1943."

In the second letter Wilson wrote:

"I have not referred to any commission in previous letters, but upon consummation of this sale whereby the writer receives $15,000 in cash, you are to be paid a commission of $1,000. After the necessity of adding the additional

machinery, which on a second-hand market would no doubt be valued at approximately $500, the reduction that you would take in your commission in accordance with our conversation, would exceed $500, and for this reason I have set forth the commission as $1,000, which is in accordance with our understanding."

Immediately after this telephone conversation Jenkins had the stenographer in his office fill out a printed form of "Contract of Sale" to read thus:

"This Agreement, made this 18th day of May, 1943, between NORWOOD WILSON, party of the first part, and W. A. MOOERS, party of the second part.

"Witnesseth: That the said party of the first part has bargained and sold, and doth hereby bargain and sell to the said party of the second part, the following Real Estate, to wit: All that lot of land located in Prince George County, Virginia, bounded on the north by the James River, on the west by Powell's Creek, and known as *Maycock's* Farm, containing 560 acres, more or less, together with improvements thereon, for the sum of $15,000 (FIFTEEN THOUSAND AND No/100 dollars) gross, payable as follows, to wit: All cash, terms of sale to be complied with in thirty (30) days, a deed of general warranty with the usual covenants of title to be executed and delivered by the said party of the first part to the said party of the second part. The said party of the second part covenants to accept and comply with the terms of said sale, as herein set forth, provided the title thereto be free from all valid objections, and doth pay down the sum of One Thousand and no/100 Dollars, the receipt whereof is hereby acknowledged, to bind said sale, which sum shall be refunded if the title is not free from all valid objections, as aforesaid. Legal possesion of said property to be given from date of settlement. Actual possession subject to lease of present tenant. The taxes, interest, insurance and rents on said property to be prorated as of date of settlement.

"The parties to this contract hereby acknowledge and agree that H. T. Richeson & Company are the agents who

brought about the sale of the property sold herein, and the party of the first part agrees to pay to the said H. T. Richeson & Company for services rendered, the full commission fixed by the Richmond Real Estate Exchange on the consideration above mentioned; and the said parties further agree that the said H. T. Richeson & Company have, with the signing of this agreement, earned their commissions.

"The following items used on the farm are included: (Here follows a list of items agreed on.)

"Witness the following signatures and seals:

"W. A. Mooers    (Seal)"

Although this contract was dated May 18, both sides agree that it was actually written on May 20, immediately after the telephone conversation between Jenkins and Wilson. The copy signed by Mooers was received by Wilson the next day (May 21), but was not executed by Wilson. It crossed in the mail the two letters of May 20 which Wilson had written Jenkins.

Mooers employed an attorney to examine the title to the property and received a report from him on or about May 26. On May 27, Mooers called upon Jenkins and insisted upon a settlement. He gave Jenkins a check for $4,000, which, together with the deposit of $1,000 previously made, made a total payment of $5,000 on account of the purchase price. He had arranged to borrow $10,000, the balance of the purchase price, from the Home Beneficial Life Insurance Company of Richmond.

Being informed by Jenkins that he had been unable to reach Wilson on the telephone, Mooers suggested that Jenkins send Wilson a letter by registered mail demanding settlement. On the same day (May 27) Jenkins wrote Wilson that Mooers was ready to settle the transaction upon receipt of a deed, "properly executed," conveying the property to "Willard A. Mooers and Ruth McDowell Mooers (husband and wife), as tenants by the entireties with the right of survivorship as at common law," and

upon the release of the "outstanding liens" disclosed by an examination of the title.

Wilson did not answer this letter and Jenkins reported the matter to Frank S. Richeson, president of the firm.

On June 3, Jenkins, Mooers and Richeson went to Hopewell to confer with Wilson. Richeson, who was the spokesman for his group at this interview, inquired of Wilson why the sale had not been consummated. Wilson replied that there were a number of details "to be ironed out before he could go through with the sale."

Wilson insisted that there should be a change in the specification of a team which Mooers would acquire in the deal, and to this Mooers readily agreed.

Wilson then said that he had given Chapin & Clarke an exclusive listing of the property, under the terms of which he would have to pay that firm a brokerage if the sale to Mooers was consummated. Richeson stated that he would undertake to get an adjustment of this matter so as to relieve Wilson of any liability to the other real-estate firm, and succeeded in doing so the next day.

Again, Wilson pointed out that Jenkins had agreed to accept a commission of $1,000, conditioned upon a consummation of the sale, whereas under the terms of the contract of sale which Jenkins had prepared and Mooers had executed, he (Wilson) was obligated to pay Richeson & Company "the full commission fixed by the Richmond Real Estate Exchange," which was $1,500, and was not conditioned as Wilson had stipulated. Richeson replied that a commission of $1,000 was "perfectly satisfactory" to his firm and that he would confirm it "by letter."

On the next day (June 4) Richeson wired Wilson that the Chapin & Clarke matter had been cleared up, and requested that Wilson come to his (Richeson's) office the following day to close the transaction. Upon receipt of this telegram Wilson wired Jenkins that it would not be possible for him to come to Richmond "until next week."

On June 5, Richeson wrote Wilson, reiterating that he had satisfied the demands of Chapin & Clarke, that the

agreed commission of $1,000 to Jenkins was satisfactory, and suggesting that Wilson come to Richmond on June 8 in order to close the transaction.

Wilson made no reply to this letter, and on June 11 he and his wife conveyed the property to H. D. Eichelberger.

At the first July, 1943, rules Mooers filed suit against Norwood Wilson, Edith N. Wilson, his wife, and H. D. Eichelberger, praying for specific performance of the contract which Mooers said he had entered into with Wilson for a conveyance of the property, and of which, he alleged, Eichelberger had notice. It appears from the bill, which was offered in evidence in the present suit, that Mooers asked for an abatement of the purchase price of the property in the event that Mrs. Wilson should decline to unite in the deed conveying her contigent dower rights therein.

Upon an appeal by Mooers from the decree of the lower court denying specific performance, we held that Wilson's letters of May 20, 1943, to Jenkins constituted "a valid contract enforceable in equity against Wilson" which "would have become mutual and binding upon" Mooers, provided he had made "an unqualified acceptance" thereof. (183 Va., at page 918, 33 S. E. (2d), at pages 793, 794.)

However, as we further pointed out, Mooers at no time during the negotiations made an unqualified written acceptance of Wilson's written offer. Moreover, we pointed out that Mooers' bill of complaint was not an unqualified acceptance of Wilson's written offer, because the bill injected an additional condition, namely, that the purchase price be abated in the event that Mrs. Wilson declined to unite in the deed to him (Mooers). (183 Va. at page 918, 33 S. E. (2d), at page 794.) For that reason we affirmed the decree of the lower court denying specific performance.

The question here presented is whether under these circumstances the brokers are entitled to recover the commission of $1,000.

Ordinarily, the undertaking of a real-estate broker is to procure a purchaser ready, willing and able to buy the property at the terms stipulated by the owner. When the broker does this he has earned his commission. In case of such an undertaking, unless his agreement with the owner so provides, the broker is not required to procure a written contract signed by the purchaser as a condition precedent to his right to recover commissions (*Low Moor Iron Co.* v. *Jackson*, 117 Va. 76, 81, 82, 84 S. E. 100), nor does his right to compensation depend upon a consummation of the sale (*Massie* v. *Firmstone*, 134 Va. 450, 455, 114 S. E. 652).

However, the undertaking of the brokers here is not of that character. According to Wilson's testimony, which the court below accepted, the property had not been listed for general sale with Jenkins' firm. Wilson merely agreed to consider any offer which Jenkins might submit to him. After the submission of several offers by Mooers, and as the negotiations progressed, Wilson wrote the two letters of May 20. One constituted an offer to sell the property to Mooers upon certain terms and conditions, which Wilson said he had just outlined in his telephone conversation with Jenkins, and the other stipulated upon what conditions Jenkins was to be paid a commission.

In the letter Wilson stipulated that "upon consummation of *this sale* whereby the writer receives $15,000 in cash, you are to be paid a commission of $1,000." (Emphasis added.)

"This sale," of course, had reference to the pending negotiations for the sale of the property to Mooers, mentioned in the companion letter of May 20. That letter referred to the fact that Mooers had deposited with Jenkins the sum of $1,000 on account of the purchase price, and that the deposit would be forfeited to Wilson should the balance of the purchase price be not paid "when proper title is presented to your prospective purchaser." It also said: "I understand that you will be ready to close this sale * * * before May 31, 1943."

Thus the payment of the commission was stipulated to be conditioned upon the consummation of the particular sale, at the particular price and within a specified time. The brokers admit that their representative undertook the sale of the property on this basis.

█ It is well settled that in an undertaking of this character the broker is not entitled to his commission unless the transaction is consummated, or unless the consummation is prevented by the arbitrary action of the owner.

As is said in 8 Am. Jur., Brokers, section 181, p. 1096: "Where a broker's commissions are expressly conditioned upon the consummation of the contract to be negotiated, performance by the parties thereto is necessary before the broker can recover his remuneration, unless such performance is prevented by the arbitrary action of his employer, in which case the condition is considered waived and the broker may recover his commissions in spite of the fact that the contract is never consummated. * * *"

The crucial issue is whether the consummation of the sale was frustrated or prevented by the arbitrary conduct of Wilson, the owner. The brokers claim that it was, and that under the principles just stated they are entitled to recover the amount of the commission agreed upon.

The owner, on the other hand, contends that the sale failed of consummation, not because of any fault of his, but because of the failure of the brokers, or their representative (Jenkins), to procure from Mooers an unqualified acceptance of the owner's offer to sell, as embodied in his letter of May 20. The owner says that not only was no valid enforceable contract entered into between him and Mooers, but that there was no actual meeting of the minds of the parties within the time stipulated for the performance of the contract, or at any time.

In our opinion the position of the owner is correct. Instead of having Mooers accept unconditionally and unqualifiedly Wilson's offer, which had just been outlined in their telephone conversation, and was later confirmed in writing, Jenkins prepared, had Mooers execute, and

mailed to Wilson a written contract which clearly injected into the negotiations two terms directly in conflict with those specified in Wilson's letters.

The tendered contract provided that the sale was to be consummated within thirty days of its date, whereas Wilson had specified that the transaction should be closed "before May 31."

Again, the contract of sale which Mooers tendered to Wilson specified that the brokers would receive "the full commission fixed by the Richmond Real Estate Exchange," which was $1500, while Wilson had specified in his letter that he would pay $1,000. Moreover, under the terms of the contract the payment of the commission was not conditioned, as Wilson had stipulated, upon the consummation of the sale.

It is elementary that in order to form a contract, there must be no variance between the acceptance and the offer. A proposal to accept upon terms varying from those offered is a rejection of the offer and puts an end to the negotiations, unless the party who made the original offer renews it or assents to the modification suggested. Having in effect rejected the offer by his conditional acceptance, the offeree cannot subsequently bind the offeror by an unconditional acceptance. See *Virginia Hardwood Lbr. Co.* v. *Hughes*, 140 Va. 249, 258, 124 S. E. 283. See also, *Measell* v. *Baruch*, 152 Va. 460, 466, 147 S. E. 203, where these principles were applied to negotiations for the sale and purchase of real estate.

It will be observed that Wilson's letter gave Mooers no option on the property or no exclusive right to buy it. It was, as we have said, merely an offer to sell the property to him upon the terms and for the period stipulated. Had Mooers accepted the offer unconditionally and in writing, a valid and enforceable contract would have been constituted between him and Wilson. *Mooers* v. *Wilson, supra* (183 Va., at page 918, 33 S. E. (2d), at pages 793, 794).

But Mooers did not accept the offer. On the contrary, he tendered a written counteroffer which had the legal

effect of rejecting Wilson's offer and putting an end to the negotiations. This left Wilson entirely free to sell the property to whom he pleased.

As a matter of fact, the record shows that when Wilson received this counteroffer he sought the advice of his attorney and was correctly advised that this was the situation.

It is true that the negotiations were resumed at the June 3rd conference, when the matters which Mooers had improperly injected into the negotiations were cleared up, but still there is no evidence that at that time, or at any other time, the parties agreed even verbally on the terms of a sale. During these negotiations neither Mooers nor Wilson was bound to the other, and each had the right to act accordingly.

Indeed, Mooers' subsequent conduct in seeking specific performance of the alleged contract of sale upon the further condition that the purchase price be abated should Mrs. Wilson be unwilling to join with her husband in the deed of conveyance, shows that Mooers was unwilling even then to have settled upon the terms originally stipulated by Wilson.

It thus conclusively appears that the sale failed of consummation, not because of any arbitrary conduct of Wilson, but because the brokers failed in the performance of their undertaking in that they did not procure from Mooers, the prospective purchaser, an acceptance of Wilson's offer of sale. See *Smith* v. *Tate*, 82 Va. 657, 664; *Vaughan* v. *Pleasonton,* 112 Va. 508, 513, 71 S. E. 529.

For these reasons the judgment is

*Affirmed.*