# Richmond

J. S. THOMPSON AND JUDY C. THOMPSON V. EDNA C. THOMPSON.

October 7, 1938.

Record No. 1957.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*A. S. Hester* and *B. B. Campbell,* for the appellants.

*S. J. Thompson* and *W. H. Jordan,* for the appellee.

BROWNING, J., delivered the opinion of the court.

This is a case of dual aspects. It first found its way into a court of law by means of an action of ejectment, but was subsequently wrested therefrom by a decree in a court of chancery, which came of the filing of a bill on the equity side of the court praying that the action of ejectment be enjoined and the rights of the defendant in the action at law be determined and adjudicated therein.

Prior to the year 1897, R. D. Thompson was the owner, or one of the joint owners, of a tract of land in Campbell county, Virginia, near Six Mile Bridge, located along the highway between Lynchburg and Concord. In a sawmill operation, he became involved in debt, and being the head of a large and, at that time, dependent family, he undertook to provide for them by conveying his landed estate to his wife for her life, with remainder to their children. This was in the year 1897. It should be said in this connection that he subsequently paid off his indebtedness, but the title to the land remained as it was fixed by the deed referred to, until February, 1926, when their children, the remainder-men in the aforesaid deed, united, with the possible exception of one, in a conveyance to Judy C. Thompson, the wife

of R. D. Thompson, and their mother, of their right, title and interest in the land referred to.

In May, 1933, Judy C. Thompson and her husband executed a deed of trust on a part of the land, which included the identical portion which is the subject of this controversy, to secure the payment of six hundred dollars. Contemporaneously therewith, they conveyed the same tract of land to J. S. Thompson, a son, the actual consideration being the assumption of the payment of the deed of trust indebtedness and the maintenance and care of the grantors, during their lives. They reserved a life estate in the said land.

In November, 1927, Judy C. Thompson and husband conveyed to their son, Herman C. Thompson, a tract of land of 4.65 acres, which was a portion of the land which was conveyed in 1897 by R. D. Thompson to Judy C. Thompson for life, etc. This tract was acquired by Herman C. Thompson from his father in, perhaps, the year 1914. He built a house and a storehouse on it and conducted a mercantile business there until his acquisition of the small tract which is the subject of this controversy, and on which he built another storehouse, which was operated by Herman C. Thompson and his wife, Edna C. Thompson, until their separation, and after that by Edna C. Thompson alone.

This tract of 4.65 acres, referred to, has nothing to do with the issues here save as the manner of the acquisition of its title sheds light upon the business habits and methods which obtained among members of this family when dealing *inter sese*.

The trial court decreed that the contract relied upon by the appellee, Edna C. Thompson, was "too vague and uncertain, the proof thereof too doubtful, and the description of the land to be conveyed, too indefinite to enable the court to compel specific performance." But it further decreed that the defendants, J. S. Thompson and Judy C. Thompson, should pay to her the sum of nine hundred dollars as compensation for the improvements which her husband and grantor, or assignor, had put upon the land. This latter

was an exercise of the court's sense of equity, based, of course, on the facts.

We think that the action of the court in denying specific performance of the contract was error. This being our conviction, it becomes needless to discuss or make comment as to any other ruling of the trial court.

█ We think the alleged contract was sufficiently definite and certain in its terms, and the proof convincing and certain enough to have warranted a decree for specific performance.

A careful consideration of the evidence reveals the lamentable fact that there was a feeling of unfriendliness in the atmosphere of the Thompson family toward the appellee. T. R. Thompson was the only one who seemed not to share this feeling. It appeared to have had its beginning about the time of the separation of Herman and his wife. Its intensity is expressed with greater emphasis by the mother of Herman and mother-in-law of Edna C., Judy C. Thompson, than any of the others. It may have had its origin in the fact that Theron Thompson, a son of Judy C. Thompson, was bound over to keep the peace at the instance of Edna C. Thompson, or it may have been that the interference of Mrs. Bernice Jones, a sister of Herman C. Thompson, in his family affairs, was answerable for its presence, or it may be ascribable to the proverbial in-law attitude of criticism and sometimes hostility. But however it arose it resulted, in our judgment, in the repudiation by Judy C. Thompson of a solemn contract made between her husband and herself and her son, she having not only had actual notice of the transaction, but participating in it by acquiescence, consent and approval.

We will now note some of the testimony which seems to present a sound basis for the above statement—testimony and facts which unequivocally establish the existence of the contract—and other incidents to which we have referred.

R. C. Worley was a witness for the plaintiff and he built the store room at the rear of the new storehouse. When he was asked if he ever heard Mr. R. D. Thompson say any-

thing about the land on which the store was built, he answered in part as follows: "Old man Dick told me then that he had let Herman have the land to build on but he wasn't going to put anything in it."

T. R. Thompson, another witness, said that he had heard his father say many times that he intended giving Herman the acre of land that the store was on, and that he knew that Herman was to get a deed to that plot of land. He further said that his mother refused to give a deed to Edna and when he was asked "Why?" he replied, "Because she didn't like her, I reckon."

B. H. Drinkard, another witness, who worked for the contractor who built the new storehouse, said that Herman Thompson told him that his father told him to move up there and build anywhere and cut off the land, and he would give him a deed to it.

W. R. Giles, another witness, who was a section foreman for the C. & O. Railway, and who had lived for twenty-two years at Six Mile Bridge, said that he was at Herman's place before the store was built and that he asked him if he had the deed, and he replied that his father would give him a deed to the piece of land which would be about an acre, and that east of the store there was a garage built and the land was to go above the garage, back to the pasture fence, behind the store and back to a small building that he had erected on the west side of the store, to the highway, and that would be about an acre.

Preston Cox, another witness, who had lived at Six Mile Bridge since 1892, said that Mr. R. D. Thompson had said to him that he gave his son the land. The witness said that he helped clear the space and that it contained about an acre.

John Wade, another witness, who lived in the vicinity, said that on one occasion when he and Mr. R. D. Thompson were sitting on the store porch waiting for Herman Thompson to come and open the store, the father said that he wished Herman would get the deed straightened out because he was not going to live always.

Edna C. Thompson, testifying in her own behalf, said that the new storehouse was built in 1927 and that Mrs. Judy C. Thompson had told her that Herman could "have the place to put the store up," and that she had heard R. D. Thompson and Judith C. Thompson both say that "they didn't see why Herman wouldn't get a deed to the place." She further stated that she had offered to pay J. S. Thompson $100.00 for the land. This was after the ejectment suit had been instituted. She further testified that she heard Mrs. Judy C. Thompson say that she would sell the land to Herman for $100.00.

Mr. W. J. Bennett, a real estate agent from Lynchburg, who was undertaking to negotiate a sale of the land that had been conveyed to the appellant, J. S. Thompson, and which included the new storehouse and the lot upon which it was located, testified that in the paper which was prepared by him, listing the property, provision was made for the payment of Mrs. Edna Thompson's interest therein, and that Mr. J. S. Thompson and Mr. Jones told him that she was to get $1,100.00. It must be said, however, that J. S. Thompson did not sign the paper, though Edna C. Thompson did sign it.

The testimony of this witness was corroborated by that of Dr. King, who accompanied the agent to the Thompson home.

Theron Thompson, who was patently inimical to his sister-in-law, was asked this question:

"Q. It was recognized by Stafford and all the rest of you that Mrs. Thompson had an interest there in the store, wasn't it?" He replied:

"A. I couldn't tell you."

Herman Thompson, the divorced husband of the appellee, testified that he never had at any time any agreement or understanding with his mother with respect to a deed to the land; that he never discussed the matter of purchasing it with her; and that when he executed the deed to his wife conveying to her the home place with general warranty of title and all of his right, title and interest in the storehouse

and land on which it was situated, that he did not intend to convey to her the storehouse and lot, and that she was cognizant of this. He said that he did not consider that he had any interest in the land, but he further testified that when he was about to buy some land from another person, his father told him to build the store on the lot for which he charged $100.00; that he believed and understood that after he gave his father the $100.00 he would receive a deed; and he further said that he built the storehouse on the faith of that understanding between himself and his father, and that he did not consider it necessary to consult his mother when his father assured him that he would sell him the tract of land on which to build his store.

Mrs. Judy C. Thompson testified that she knew that the store was being constructed; that she saw the work going on; that her husband told her that he had directed Herman to build the new storehouse; that she did not urge any objection to it; that her husband generally did things to suit himself, and that she did not take his business into her hands; that she heard her husband say that he expected Herman to pay him for it. This question was asked her and the answer quoted was elicited:

"Q. Was it your intention then to see Herman put his money into building the store that cost $1,000.00, and you were to later take the store away from him?

"A. Take it away from him if I wanted to, if he didn't behave."

As to her business relations with her husband, Mrs. Judy C. Thompson was asked these questions and gave these answers:

"Q. Did he ever ask you for permission to sell any of your lands?

"A. Well, yes, sir, he said something about selling that hill down there once. A man wanted to buy it and put up a store down there on that hill called 'Lee's Hill' and I told him I wasn't going to do it, and I refused him, and it was all right with him. Wasn't another word said, and he said,

'I reckon it's best not to,' but when he said he had turned it over to Herman, then I was with him.

"Q. That same place?

"A. Yes, sir, the place down where the store was put up."

J. S. Thompson, appellant, testified that he heard his father and Herman talking about building the store and they said that Herman was to pay $100.00 for it. He also corroborated what the witness Bennett testified to as to the recognition of Mrs. Edna C. Thompson's interest in the land in the paper listing the witness' land for sale, although he said that he did not recognize that she owed anything but in order to have a peaceable settlement he would give her the excess of the actual sale price of the land over the price he asked, and he made her an out and out offer of $500.00 in order to have a settlement.

We have thought it well to point to these specific instances relating to the making and existence of a contract between the parties, though it has been done at the expense of brevity.

The opinions in similar cases in this and other jurisdictions and the text writers upon the subject of the specific performance of contracts, and the avenue of equity being the medium through which it is attained, make the fact of the possession of the land for a period of years and the placing thereon of permanent and expensive improvements the determining consideration as to the fitness of the interposition of equity as the remedial agency.

We take this apt quotation from the Am. & Eng. Ency. of Law, 2d Ed., Vol. 26, p. 14:

"It has been observed with particular reference to specific performance that in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. The jurisdiction of courts of equity is not now, therefore, confined within the narrow limits that once bound it. The constant tendency has been to broaden their powers, and especially has this been true in suits for specific performance."

This is an eminent statement of progress which may be accentuated thirty-five years later than the time it was made.

We think that the abstract or analysis of the testimony which we have quoted with the incidents of possession and the construction of improvements constitutes ample proof of the contract which was relied upon by the plaintiff in the trial court.

It is urged that it is indefinite, but the answer is that there was a certain consideration named by the seller; that there can be no doubt about the identification of the land sold; that the minds of the parties met upon its terms save as to the time of the payment of the purchase price and the delivery of a deed to the purchaser; that the seller might have demanded and recovered the purchase price at any time upon his or her delivery of a deed, which, in our jurisdiction, was their duty.

It has been held that the description of land by a contract for conveyance does not need to be set forth with the precision of metes and bounds and monuments. Am. & Eng. Ency. of Law, 2d Ed., Vol. 26, p. 36; *Myers* v. *Metzger,* 61 N. J. Eq. 522, 48 A. 1113.

It is also said that the maxim *id certum est quod certum reddi potest* is applicable in actions for specific performance. So where the intention of the parties can be clearly ascertained from the language of the contract, it will be enforced accordingly, though it is inartificially expressed. Am. & Eng. Ency. of Law, 2d Ed., Vol. 26, p. 38; *Colerick* v. *Hooper,* 3 Ind. 316, 56 Am. Dec. 505.

It is of no moment that the senior Thompsons conveyed the land to the appellant, J. S. Thompson, without regard to the rights of Herman Thompson's grantee, who was his wife. They, of course, were perfectly cognizant of the details of the whole transaction, including the rights of the appellee, and J. S. Thompson, their grantee, knew all about the entire matter. He was not an innocent purchaser for value without notice.

It is true that they placed a deed of trust upon the land in favor of a building and loan association, but when

that was done, the rights of the appellee were in existence, and all the parties had actual notice of their physical status and constructive notice of their legal being, and the appellee is entitled to have specific performance of the contract and the property going to her thereunder relieved from the onus of the trust deed. We find the following in the Am. & Eng. Ency. of Law, 2d Ed., Vol. 26, p. 40:

"Where a conveyance is made in order to put it out of the power of the grantor to fulfill a contract previously entered into with the knowledge or concurrence of the grantee, the transaction will be declared null and void, and, if the proper parties are before the court, a decree will be rendered compelling a conveyance to the party rightfully entitled."

The conveyance we have been considering strongly smacks of that flavor.

The appellee and her husband placed upon the land the improvements referred to at a cost of certainly more than $1,200.00. They remained in possession of it for some eight years, and after their separation and the settlement of their property rights, she remained in possession of it for more than three years, that is, to the time of the institution of this litigation. It is inconceivable that reasonable persons would do all of these things and expend the money which they did, if there had been no contract justifying it. The acts and conduct of the appellee and her husband with reference to the land would be difficult of explanation in the absence of the existence of a contract such as the one sought to be established by parol testimony, and they are perfectly consistent with such a contract. It is noteworthy, too, that during the years of possession emphasized by the acquisition of valuable improvements and the conduct thereon of a growing and profitable mercantile business, no form of protest or question of their right to do so was made against Herman Thompson and his wife. It will also be remembered that all of these people lived practically together. They were in almost calling distance of each other

until some members of the family married and went to live in the nearby city of Lynchburg.

Much is sought to be made by the appellants of the fact that the appellee and her husband united in the deed of 1926 by the Thompson children and remaindermen to Judy C. Thompson, conveying to her the land which included that which they claimed themselves. The reason for this is perfectly patent. Theretofore, Mrs. Thompson had only a life estate. Thereafter, she was vested with a fee simple title, with the exception of the outstanding interest of Theron Thompson. It was the only way by which the appellee and her husband could secure a good title under a deed from Judy C. Thompson and her husband, and it placed them in a position to perform the contract which they had made, which was impossible of accomplishment otherwise.

The testimony shows beyond cavil that Judy C. Thompson acquiesced in, consented to, and approved the contract which was actively negotiated by her husband.

When the family relations ceased to be pleasant, she made an effort to parry her contractual obligations and we have the pathetic figure of Herman Thompson denying the contract in one breath, and affirming it in another. He was torn between conflicting emotions. He was trying to be loyal to his mother and brothers and sisters, but, on the other hand, the truth was tugging at him and it would out, even though it was of benefit to his estranged wife and her two children.

The cases of *Frizzell* v. *Frizzell*, 149 Va. 815, 141 S. E. 868, and *Cannon* v. *Cannon*, 158 Va. 12, 163 S. E. 405, contain recent expressions of this Court in very similar cases to that under consideration, which are highly illuminative of the doctrine of specific performance as the appropriate remedy affording equitable relief in congruous cases. *Effinger* v. *Hall*, 81 Va. 94, is one of the older cases from this Court which is enlightening, and sustains the conclusions which we have reached, though it is cited in the briefs of both sides of this litigation.

It seems needless to say more. The trial court erred in not decreeing specific performance of the contract. We reverse its decree and remand the case to it for the entry of a decree which will effectuate the principles herein enunciated.

*Reversed and remanded.*