## Richmond

VERNARD F. BOND AND AUDREY A. BOND v. JOSEPH P. CRAWFORD, SR., ET AL.

March 10, 1952.

Record No. 3886.

Present, All the Justices.

The opinion states the case.

*Clarke, Richard, Backus & Moncure,* for the appellants.

*Hardee Chambliss, Jr., E. A. Prichard* and *Bernard M. Fagelson,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Vernard F. Bond and Audrey A. Bond filed their bill in the

court below praying for specific performance of the following agreement:

"Alexandria, Virginia, Aug. 6th, 1949

"This memorandum of agreement by and between J. P. Crawford Sr. and Clara Crawford wife and Vernard F. Bond.

"Mr. and Mrs. J. P. Crawford hereby sells the following properties to Vernard F. Bond and Audrey A. Bond for the sum of $11,000.00 to be paid as follows: $500.00 which is hereby acknowledged and the balance upon delivery of deed. The lands described as following, Lots 44, 45, 16, 17, 18, 15 and Saint Johns Church property all Cameron View, Fairfax County Va. You will find that some of the Church property was deeded to State of Virginia, but Bond is to get the balance. Taxes and insurance to be prorated. There is a deed of trust which Bond holds on the property except the Church property. Also a deed of trust on the Church property notes in Richmond, Va., held by the church trustees which will give you street address later.

"The deposit is Five Hundred Dollars.

"(Signed) J. P. Crawford
"(Signed) Clara Crawford
"(Signed) Vernard F. Bond"[1]

In addition to the Crawfords the bill made parties defendant Max London and Ben London, to whom it was alleged that the property had been subsequently conveyed in derogation of the plaintiffs' rights, and Bernard M. Fagelson, trustee in a deed from the Londons securing a part of their purchase price.

The prayer was that the Crawfords be required to perform specifically the agreement with the plaintiffs and give them "a good and sufficient deed" to the property; that the conveyance by the Crawfords to the Londons, and the deed of trust from the latter to Fagelson, trustee, be declared null and void and set aside.

The Crawfords filed a joint answer in which they admitted the execution of the agreement, but alleged that on August 29, 1949, and again on September 1st, Vernard F. Bond had verbally "renounced" and rescinded the contract and requested a return of his deposit of $500; that they, the defendants, "having elected to treat said contract with Vernard F. Bond as

---

[1] Following the signatures is a notarial certificate certifying that Bond acknowledged his signature on September 3, 1949. There is also appended a certificate showing that the instrument was recorded in the clerk's office of the Circuit Court of Fairfax county on September 3, 1949, at 11:10 a. m.

breached," entered into an agreement on September 1, 1949, to sell the property to Max and Ben London.

The answer further alleged that thereafter Bond had "requested" that the defendants execute a deed conveying the property pursuant to the terms of the contract; that on September 13, 1949, the defendants had tendered to the Bonds "a good and sufficient deed of special warranty" and requested settlement of the transaction, but that the Bonds had refused to accept the deed and pay the purchase price.

The Londons filed a joint answer and cross-bill in which they alleged that on September 1, 1949, they had entered into a valid contract with the Crawfords to purchase the property for $12,500, and that this agrement had been consummated by the conveyance of the property to them by deed recorded September 20th.

The cross-bill prayed that the Bonds' bill for specific performance be dismissed and that the Crawford—Bond contract of August 6, 1949, which had been recorded in the local clerk's office, be declared "null and void and removed as a cloud upon the title to the real estate" which they (the Londons) had purchased.

There was a decree of reference to a master commissioner who was directed to ascertain and report among other things, whether or not the plaintiffs were "entitled to the relief prayed for" in their bill of complaint. The evidence on behalf of the parties, taken in the presence of the commissioner, shows these facts:

In 1947 Crawford, who had been a real estate broker for nearly thirty years, purchased from a special commissioner a tract of land in Fairfax county, known as St. Johns Church property, which was adjacent to six lots owned by him in Cameron View, a near-by subdivision. This church property and the adjacent lots are the subject of the present controversy.

On March 23, 1949, Crawford, who was then in straitened financial circumstances, borrowed $2,000 from Bond and gave in return his note, payable to bearer sixty days after date, in the sum of $2,200, secured by deed of trust on the Cameron View lots. On previous occasions Bond, who is a man of considerable means, had loaned money to Crawford and in each, as in this, instance had charged him a ten per cent premium over and above the legal rate of interest. At the time of the transaction with

which we are concerned all of these loans except that evidenced by the note of $2,200 had been paid.

On Saturday, August 6, 1949, Bond went to Crawford's house and offered to buy the St. Johns Church property and the adjacent lots. After some negotiations the parties finally agreed upon a sale at $11,000 cash, and the contract which is the subject of this suit was typed by Bond and signed by him and Crawford. Bond gave a check for $500, payable to Crawford and his wife.

Mrs. Crawford, who had been preparing a meal while the bargaining was taking place, looked over the paper prepared by Bond and refused to sign it until she had consulted counsel. After having talked to her attorney over the telephone Mrs. Crawford signed the contract on Monday morning, August 8th, and Crawford took it to Bond's office.

Bond testified that he told Crawford that he wanted a "general warranty deed" to the property. The Crawfords do not deny that Bond made this request, but say that they told him that they could give only a special warranty deed to the church property, as such was the character of the deed by which they had obtained title to it. In any event, the contract did not specify what type of deed was to be given.

On August 8th Bond delivered the contract to Davis-Ruffner Title Corporation and asked that concern to issue or procure a policy insuring the title to the property. During the month of August, Bond was informed by that corporation that the title to the church property was not insurable. Bond conveyed this information to Crawford who assured him that a policy could be procured through the office of John W. Rust, a member of the local bar.

It later developed that after some correspondence Rust succeeded in procuring a letter, dated September 20, 1949, from Lawyers Title Insurance Corporation of Richmond, stating that it would insure the title. During this interim Bond insists that he was ready and willing to consummate the transaction on his part.

Crawford testified, however, that on either August 29th or 30th Bond telephoned him that, because of the questionable title, "he did not want" the property. Crawford further testified that on the morning of September 1st, before he had left home, Bond called and told him in the presence of Mrs. Crawford, their son,

Archie, and their daughter, Catherine, that "the deal was off" and that he (Bond) wanted the $500 deposit returned to him. Crawford's testimony is corroborated by that of his wife and their two children.

Bond, however, strenuously and repeatedly denied that he had ever called the deal off or signified any intention not to consummate the transaction. Moreover, Bond says that on September 1st Crawford came to his office, tendered him a copy of a special warranty deed, and demanded that the transaction be consummated on this basis, and that he (Bond) declined to do so.

On September 1st, between two and three p. m., the Crawfords signed a contract agreeing to convey the property to the Londons for $12,500.

On the same day, about five p. m., Crawford went to Bond's office after the latter had gone home, leaving the office in charge of Russell G. Jones. Crawford offered Jones his (Crawford's) check for $500 payable to Bond, representing the return of the cash deposit which Bond had made at the time of the execution of the contract of August 6th. Jones telephoned Bond of this and was instructed not to receive the check. Crawford, however, refused to accept a return of the check and left it with Jones.

The next day Bond wrote Crawford a letter, which he sent by registered mail, returning Crawford's $500 check and insisting that the transaction be consummated.

On September 3rd, after having acknowledged his signature to the contract before a notary, Bond had it recorded in the local clerk's office.

On September 13th Crawford and wife executed and tendered to Bond a special warranty deed to the property and demanded settlement. Bond declined to accept this deed, insisting that he was entitled under the terms of the contract to a general warranty deed.

On September 20th a deed conveying the property from the Crawfords to the Londons was recorded in the local clerk's office. Simultaneously therewith there was recorded a deed from the Londons to Fagelson, trustee, conveying the property to secure the deferred portion of the purchase price.

While Crawford testified that the consideration for the conveyance of the property to the Londons was $12,500, he discounted the deed of trust note or notes at a cost to him of $2,105, thereby realizing the net sum of $10,395 from the sale. This was

$605 less than the cash price of $11,000 at which he had agreed to sell the property to Bond.

Crawford testified that at the time he executed the contract of sale with the Londons he did not tell them of his prior contract and dealings with Bond. But it appears from other evidence that the Londons had actual notice of such transaction. John C. Wood, an associate of Rust, testified that the Londons inquired at the Rust office as to the status of the title to the property and were informed of the Crawford-Bond contract and told that "settlement would have to be made in some manner with Mr. Bond before they could take a title." There is no denial of this.

On the evidence adduced the commissioner filed a report holding that the agreement was valid and enforceable; that the evidence did not sustain the Crawfords' contentions that the contract had been procured through duress or undue influence, or that the Bonds had voluntarily cancelled and rescinded it; that under the terms of the contract it was the obligation of the Crawfords to deliver to the Bonds a deed conveying the property with general warranty, which they had failed to do; that the Bonds were "ready, willing and able to carry out their purchase" of the property; and that they had tendered before the commissioner the balance of the purchase price in full and were entitled to specific performance.

The commissioner further held that the deed whereby the Crawfords had conveyed the property to the Londons, and the deed of trust from the Londons to Fagelson, trustee, to secure a portion of the purchase price, should be "declared null and void" and set aside.

On exceptions to the commissioner's report the court entered a decree overturning the report, holding that the Bonds were not entitled to specific performance of the contract, and dismissing their bill.

From that decree the Bonds have perfected this appeal. In short, their contention is that the findings and conclusions of the commissioner were correct and those of the trial court were erroneous.

The decree appealed from assigns no reason for overturning the commissioner's report other than that "it appearing to the court from a review of the evidence * * * that the relief asked for in the bill of complaint should be denied." In their brief

the appellees say that, "It was unnecessary for the court to determine that the contract of August 6, 1949, was invalid. It was necessary for the court to decide only that under all the circumstances it would be inequitable to enforce the 'contract.'"

█ It is true that specific performance in equity is not a matter of right but rests in the sound discretion of the court or chancellor. 17 Mich. Jur., Specific Performance, § 4, p. 8 *ff*; 17 Va. and W. Va. Digest (West), Specific Performance, § 8, p. 34 *ff*. But it is equally well settled that:

"* * * the discretion which may be exercised in this class of cases is not an arbitarary or capricious one, depending upon the mere pleasure of the court, but one which is controlled by the established doctrines and settled principles of equity. And this discretion is governed by the circumstances of each particular case.

"* * * Generally, where a contract respecting real property is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree specific performance of it, as it is for a court of law to give damages for a breach of it. * * *" 17 Mich. Jur., Specific Performance, § 4, pp. 9, 10. See also, *Walker* v. *Henderson*, 151 Va. 913, 933, 145 S. E. 311.

On this appeal the appellees give the same reasons assigned by them in the lower court why they say the contract should not be specifically enforced.

They say the contract was void and unenforceable because their purported consent to it was procured through duress or undue influence on the part of Bond, who took advantage of Crawford's straitened financial circumstances and threatened to foreclose the past due deed of trust of $2,200 which he (Bond) held on a portion of the property. The deed of trust, in terms, provided for such right of foreclosure upon default in the payment of the debt secured.

█ The authorities are in accord that the threatened act must be wrongful to constitute duress. Consequently, a threat to do what one has the legal right to do, such as to foreclose or exercise the power of sale on a mortgage, is not such duress as to justify rescission of a transaction induced thereby. Williston on Contracts, Rev. Ed., Vol. 5, § 1606, p. 4500 *ff*; 17 Am. Jur., Duress, etc., § 17, p. 892; 17 C. J. S., Contracts, § 172, p. 532; *Morrill* v. *Amoskeag Sav. Bank*, 90 N. H. 358, 9 A. (2d) 519, 524.

But aside from this, there is positive evidence, as well as other circumstances, which justified the finding of the commissioner, who saw and heard the witnesses, that the contract had not been procured by duress or undue pressure.

Bond vigorously denied that he had procured the Crawfords agreement to sell the property by such threats. He said that he voluntarily granted indulgence in the collection of the debt. Certainly, there is no evidence that he mentioned the matter to the trustee or took any steps looking toward a foreclosure.

In the meantime Crawford had sued Bond to recover the usurious sum of $200 which Bond had exacted of him for making this loan, and compromised the claim by collecting $175 thereon. This strongly negatives the claim that Crawford was fearful of a foreclosure or at a loss to know how to protect his rights.

Moreover, while Crawford executed the agreement on August 6th, Mrs. Crawford postponed her signature until two days later in order that she might consult counsel. After having done this she voluntarily signed the agreement, and there is no contention that in the meantime Bond had exerted any pressure on her or her husband to force her to sign.

But one of the most significant things about this asserted defense of duress is that it was not mentioned in the Crawfords' answer to the bill. Manifestly, it is inconsistent with the position taken in the answer that the Crawfords tendered the Bonds a special warranty deed in recognition of what they (the Crawfords) conceived to be their obligation under the contract.

The main contention of the Crawfords is that Bond voluntarily abandoned or rescinded the contract when he telephoned Crawford, either on August 29th or 30th, that he did not want the property, and when he told Crawford on September 1st, in the presence of Mrs. Crawford and their children, that "the deal was off." Relying upon such abandonment, the Crawfords say that they then agreed to sell the property to the Londons, and that thereafter Bond changed his mind and insisted upon the consummation of the purchase. But as has been said, Bond strenuously denied these conversations, or any other which indicated an intention on his part to rescind the contract.

It is true that a written contract for the sale of land, while still executory, may be rescinded by a subsequent oral agreement between the parties. But the burden is on the person attempting to establish the rescission to prove it by clear and convincing

evidence. *Colvin* v. *Butler,* 150 Va. 672, 682, 143 S. E. 333; *Miller* v. *Kemp,* 157 Va. 178, 192, 160 S. E. 203, 84 A. L. R. 980; 16 Mich. Jur., Rescission, etc., § 27, p. 160.

While evidence of the physical destruction of the instrument is not necessary to establish rescission it is usually present in such cases.

In the case before us, although the Crawfords say that Bond called at their home on the morning of September 1st and told them, in no uncertain words, that "the deal was off," he did not return, or offer to return, the contract to them, nor did he destroy it. Neither did Crawford suggest that the contract be returned or destroyed. Surely, one who has been trading in real estate for thirty years is bound to have known that an outstanding executory contract would be a serious impediment to a future sale of the property.

But that is not all. The uncontradicted evidence is that despite the claim of rescission, on September 13th Crawford tendered Bond a deed conveying the property with special warranty. It is incomprehensible that such a tender would have been made if Crawford had thought that the Bonds had abandoned the transaction.

In this situation we think there is ample evidence to support the finding of the Commissioner, who saw and heard the witnesses, that the Crawfords had not sustained the burden of proving the rescission of the contract.

Next, the appellees say that the contract was lacking in mutuality, in that it did not obligate the Bonds to purchase the property.

Aside from the fact that no such defense was asserted in the answer, the claim is without merit.

The contract provides: "Mr. and Mrs. J. P. Crawford hereby sells the following properties to Vernard F. Bond and Audrey A. Bond for the sum of $11,000.00 to be paid as follows: $500.00 which is hereby acknowledged and the balance upon delivery of deed."

While crudely drawn, the plain intent of the memorandum is that the stated purchase price is "to be paid" by the purchasers.

In any event, the matter is put at rest by the bill filed on behalf of the Bonds in which they ask for specific performance of the agreement. As we said in *Boston* v. *Shackelford,* 162 Va. 733, 751, 175 S. E. 625, "A contract may be unilateral, but, when

suit is brought for its enforcement, he who has not theretofore been bound will be deemed to have consented to it in writing and to have made the obligations mutual.'' See also, *Mooers* v. *Wilson,* 183 Va. 910, 919, 33 S. E. (2d) 791, 794.

The appellees next contend that ''the sharpness of the bargain,'' or inadequacy of the purchase price, justifies a denial of specific performance. The argument is that witnesses on behalf of the Bonds testified that the property was worth $16,500 at the time the contract was signed, that Bond placed the value even higher, and yet he agreed to give the Crawfords only $11,000 cash for it.

But Crawford was no novice in such matters for he had been trading in real estate for thirty years. It is significant, too, that even before the Crawfords had settled their difficulties with the Bonds they entered into a contract to sell the property to the Londons for $12,500, and then discounted the note or notes given for a portion of the purchase price at such a figure as to net them $605 less than they would have realized from the consummation of their contract with the Bonds.

Moreover, a denial of specific performance will not restore the property to the Crawfords or enable them to dispose of it at a higher price than that at which they agreed to sell it to the Bonds. By their deed to the Londons, the Crawfords have parted with their interest in the land. Thus, the real beneficiaries of a denial of specific performance would be the Londons who consummated the purchase of the property after they had actual knowledge of the Bonds' claim to it.

Finally, the appellees contend that specific performance of the contract should have been denied because, they say, Bond's hands were ''unclean,'' in that he had loaned Crawford moneys on this property, as well as on previous occasions, at usurious rates of interest.

It is well settled that the clean hands maxim does not operate to bar a sinner forever from a court of equity. As Mr. Justice Brandeis put it in *Loughran* v. *Loughran,* 292 U. S. 216, 229, 54 S. Ct. 684, 689, 78 L. ed. 1219, ''Equity does not demand that its suitors shall have led blameless lives.'' The misconduct relied on must relate directly to the matter in litigation. It is not sufficient that the wrongdoing is remotely or indirectly connected with the subject of the suit. 30 C. J. S., Equity, § 98-c, pp. 491, 492; *Highland* v. *Davis,* 119 W. Va. 501, 195 S. E. 604, 612.

■ Here the wrongs done are things of the past. The usurious loan on this particular property is remote from and collateral to the cause of action sued on and constitutes no defense to it. *Loughran* v. *Loughran, supra; Highland* v. *Davis, supra.*

On the whole we find no substance to the contention of the appellees that it would be inequitable and unjust to grant specific performance of the contract of August 6, 1949. The court erred in not granting the relief prayed for.

■ Since the contract was silent on the subject, and there was no agreement to the contrary, the vendees are entitled to a deed with general warranty and the usual covenants of title. *Goddin* v. *Vaughn,* 14 Gratt. (55 Va.) 102, 117; *Ford* v. *Street,* 129 Va. 437, 445, 106 S. E. 379.

The deed from the Crawfords to the Londons, and the deed of trust from the Londons to Fagelson, trustee, both recorded on September 20, 1949, should be declared null and void. *Thompson* v. *Thompson,* 171 Va. 361, 198 S. E. 897.

The decree complained of is reversed and the cause remanded for the entry of a proper decree in conformity with the views here expressed.

*Reversed and remanded.*