## Richmond

B. W. POND, ET AL. v. NEWBILL J. FISHER, ET AL.

January 18, 1960.

Record No. 5028.

Present, All the Justices.

The opinion states the case.

*Louis B. Fine* (*Howard I. Legum; Fine, Fine, Legum, Weinberg & Schwan*, on brief), for the appellants.

*Edward R. Willcox, Jr.* and *T. Lanier Sawyer* (*Willcox, Cocke, Savage & Lawrence*, on brief), for the appellees.

MILLER, J., delivered the opinion of the court.

On September 18, 1958, Newbill J. Fisher, Jane W. Fisher, Rubie N. Fisher, and Thomas M. Fisher, hereinafter at times called complainants, filed their bill in equity against B. W. Pond and Lula W. Pond, hereinafter at times called defendants, praying for specific performance of a written contract of May 28, 1958, whereby defendants agreed to purchase from complainants a parcel or tract of land in the city of Norfolk, Virginia, with improvements thereon, for the price of $18,000.

When the contract was signed, there was no recorded plat of the property, and the description in the contract is not by metes and bounds or by reference to a plat. In that instrument it is designated as the property of Newbill J. and Lottie Fisher and as "being situated at the Southwestern most part of Granby Shores fronting on Mason Creek and being direct North [South] of Commodore Park, and direct South of property presently known and numbered as 201 thru 209 West Bayview Boulevard, in the City of Norfolk, Virginia. All land, buildings and improvements thereon. Consisting of one and 4/10 (1 4/10) acres of land, more or less."

After the contract was signed, an unrecorded plat was discovered and the property resurveyed. In the bill it is described with particularity by reference to the plat and by metes and bounds, and the contract is filed with the bill as exhibit A. This contract is executed by all persons interested in the property, and it provides that settlement shall be made on or before the 27th day of August, 1958, or as soon thereafter as the title can be examined and the papers prepared.

The bill also alleges that on the day fixed for the settlement complainants were ready, willing, and able to deliver fee simple title to defendants by good and sufficient general warranty deed, together with full possession of the property, and that such a deed (which was dated August 26, 1958) was tendered to defendants but they refused to accept it and pay the purchase price.

In their answer defendants asserted that complainants knew that their purpose in buying the property was to subdivide it, and as an inducement for the contract, complainants represented to them that the property "could be subdivided and sold in parcels." They also alleged that complainants assured them that the property "included a lane eighteen (18) feet wide" and defendants relied upon these representations but later learned that the land could not be subdivided

and did not include an eighteen foot lane. In conclusion they state that they were not afforded ingress and egress to and from the property and that complainants were unable to convey a marketable title free from encumbrances and restrictions when they tendered the deed.

After hearing the testimony *ore tenus* and considering the several exhibits, the chancellor concluded that complainants were entitled to prevail and decreed that the purchasers specifically perform their contract. From that decree we granted defendants an appeal.

In their assignments of error defendants assert that the court erred (a) by excluding certain testimony of George H. Gray and Lula Pond; (b) because the evidence does not sustain the factual findings of the chancellor; (c) in decreeing specific performance because the property is encumbered by an easement right of way, and (d) because the decree directs the conveyance of more property than complainants owned, and the description in the decree differs from that in the tendered deed. They also allege that the court erred because the evidence discloses that it is inequitable to require them to specifically perform the contract.

The subject parcel of land as it is described in the decree appears in the diagram below:

An inspection of the diagram will disclose that considerably more area than 1-4/10 acres is included within the boundary lines and that ingress and egress to and from the property is had along a road or right of way twelve feet wide which ends at the northeast corner of the land. The full length of this twelve-foot road is not shown on the diagram but the testimony and other exhibits show that it extends from the property 294.52 feet to where it adjoins a public street. The decree provided that the property within the four corners of the diagram, both above and beyond the "water line" of Mason's Creek, described by metes and bounds, along with the twelve-foot access right of way be conveyed to defendants. However, the twelve-foot lane is to be conveyed subject to a perpetual easement of way therein previously granted as appurtenant to an adjoining parcel of land.

On May 25, 1958, just before the sale was made, M. C. Simpson, a local real estate agent, learned that defendants were interested in the property, and on that date after inspecting the premises, he went to the home of Newbill J. Fisher for the purpose of listing the property for sale. When he arrived at Fisher's home, defendants were

PROPERTY OF
# N.J. FISHER
NORFOLK, VA
Scale 1" = 50'    April 1953
J.M.BALDWIN, CE
R.S BALDWIN, CLS

Exhibit No. 7

there talking with Fisher about buying the land, and during the brief conversation that ensued, Fisher said: "Let's let Mr. Simpson handle it." That is when Simpson was engaged by Fisher as agent of the owners, and within a day or two defendants agreed to purchase through him and deposited $1,000 on the purchase price. However, the written contract was not excuted when the deposit was made because defendants wanted to have the title examined before signing the contract.

Lulu Pond testified that she first became interested in the property through Mrs. Page, one of Simpson's agents who called and told her that "she had some property that I could divide and make some money off. So I figured Simpson must have known what it was all about." The witness said that in this conversation with Mrs. Page, which was had before complainants listed their property with Simpson for sale, she told Mrs. Page that she wanted the property to "build a house on it, sell off some lots" and that she did not want to buy it all for her own use. She also testified that Mr. Simpson made the remark that three split-level houses could be put on the property but she did not specify the date on which Simpson made that remark.

When questioned about what property she thought she was buying and how she got to it, she testified as follows:

"Q. What property were you buying?

"A. I was supposed to be buying the Fishers', I guess.

"Q. How were you supposed to get in and out of the property?

"A. I just went down the road, that is all. Nobody didn't say anything about it.

"Q. Well, did you see any lane in there?

"A. I thought it was the City's.

"Q. Thought what?

\*      \*      \*      \*      \*      \*      \*

"A. I thought it was the City's when I went down it."

She then answered questions propounded by the court as follows:

"Q. You went down and saw the land before you signed the contract?

"A. Yes.

"Q. You saw what you were buying?

"A. Yes.

"Q. And you got down there through a lane or a road?

"A. That is right."

Upon cross-examination she testified that nothing was said to her by anyone about a "lane", and she thought that the lane belonged to the city.

Eugenia Sandys, a witness on behalf of defendants, went with Mrs. Pond to see Mrs. Page and Mr. Simpson when she agreed to buy the property. She testified that in the course of the conversation with Mr. Simpson, Mrs. Pond told him that she would like to make a deposit on the property and did deposit a $1,000 check with the agent. After delivery of the check Mrs. Pond was asked by Simpson what she intended doing with the property, to which she replied: "Well, I think I will sell some lots and build me a home on there." To this announcement Mr. Simpson replied, "I had a builder out there looking at this property and thought of * * * We figured on putting three split levels on it."

George H. Gray, an attorney at law who examined the title for defendants before they signed the contract, testified that the boundary line of the property that the Fishers owned could not be definitely fixed. However, he explained that title to the property was good but the boundary lines could not be determined without a survey. His conclusions were stated thus:

"Well, I am stating what I found as best I could. But in any event, I found that the title to the property that the Fishers did own was a good title. The only question was the location of the boundaries and the roadway. Mrs. Pond wanted to buy this property and so this contract was prepared I think by Mr. Simpson. No objection was made to the contract because it was understood that Mrs. Pond was going to have a survey made to find the exact location of the boundary. And a survey was made. The difficulty was, we didn't get the survey back until—

"By the Court:

"Q. after the contract—

"A. after the contract was signed, of course, and the contract was signed because the property which the Fishers owned they did have good title to. The question was what the boundary lines of the property were, and as Mr.—

"Q. Who was raising that question about the boundary lines? Either one of the parties?

"A. No one was raising any question about the boundary lines at that time. The only question was to have a survey made to determine where the boundary line was. But then after a survey was

made and it came back and the survey indicated that this property could not be reached from the road or public road—"

The witness then said that the description of the property in the contract was "very vague and general because they didn't know what the boundaries were"; that the deed tendered to defendants conveyed more land than complainants owned and gave defendants "no access to any public road." In describing that property he said that it was landlocked but admitted that when he examined the title, he was not aware of the existence of the diagram, exhibit No. 7, because that plat was not of record.

M. C. Simpson, called by defendants as an adverse witness, testified that Lula Pond did not tell him that she wanted to sell off any part of the land or what she wanted to do with the property; that when he effected the sale, he did not know what the width of the lane was that furnished ingress and egress to and from the property nor did he discuss the lane with Mrs. Pond. To the following inquiries he answered as indicated below:

"Q. * * * Didn't Mrs. Pond tell you that she could not use all of that land for her residence but was going to sell some of it off?

"A. No, sir, she did not.

"Q. Didn't tell you. You are sure?

"A. I am positive."

Rubie Fisher was asked what Mrs. Pond told her about the property; her answer was, "She didn't tell me anything because I never talked to her," either before or after the contract was signed.

An ordinance of the city of Norfolk introduced in evidence which was in effect when the contract was signed, forbids the subdivision of land into building lots unless the lots front on a public street at least fifty feet wide. The deed of August 26, 1958, tendered defendants, did not convey the twelve-foot lane extending from the northeast corner of the lot 294.52 feet to the public street. However, with that exception, the description of the property conveyed by this deed is substantially the same as that disclosed in the diagram and as set out in the decree. The description shows that the southern end of the twelve-foot lane adjoins the acreage at its northeast corner as it appears on the diagram. Other exhibits introduced in evidence show that this twelve-foot lane was owned by the complainants, subject, however, to a perpetual easement of right of way appurtenant to land that had been previously granted.

The testimony offered by Mrs. Pond and excluded by the

court consists of a colloquy she had with Rubie N. Fisher and Simpson after the title had been examined and the contract signed, and a self-serving statement made by her during the colloquy. Some question had arisen as to the width of the lane leading to the property and Lula Pond said she talked to Rubie N. Fisher and Thomas M. Fisher, and they insisted it was eighteen feet wide. She then told them that as the right of way was only twelve or eighteen feet wide, she "couldn't sell off any property," and that the house was in poor condition. She concluded the colloquy by saying: "They still use the spring and it has no bathroom. It just wouldn't serve my purpose at all. I thought about building a home, selling off a couple of lots."

The testimony of George H. Gray, which was excluded by the court, was a recital of a conversation had in his presence between Lula Pond and Rubie Fisher which occurred several months after the contract was executed. Gray's account of this conversation follows:

"On the 12th of August I went there with Mrs. Pond to look at the property. It was the first time I had ever seen it and Mrs. Rubie Fisher was there. And Mrs. Pond told Mrs. Fisher that she couldn't take that property with that 12-foot right of way because she couldn't subdivide it. And Mrs. Fisher says, 'Well, if you don't want to take it, you don't have to.' "

We find no error in the ruling of the court that excluded this testimony of Lula Pond and George H. Gray. The excluded testimony in each instance had to do with alleged conversations which occurred a considerable time after the contract had been executed. They were not offered to impeach any witness, nor did either tend to show that any representations as to whether or not the property could be subdivided had been made by any of the complainants before the contract was signed. The testimony offered by Lula Pond was subject to the further objection of being a self-serving statement made after the rights of the litigants had been fixed.

When the chancellor concluded that complainants were entitled to specific performance of the contract, in a brief statement he said that the title examiner found that complainants owned a fee simple in the "property described in the contract." Though the evidence showed that Lula Pond expected and had planned to subdivide the property, yet the chancellor also found and said that these expectations and beliefs were not communicated to complainants nor did they know anything about her purpose to subdivide the land

until after the contract had been executed. He expressly stated that there was "no mutual mistake."

The evidence supports these conclusions. Complainants were not obligated to communicate any facts to defendants concerning the land or the means of ingress and egress to and from the property, and a careful scrutiny of the evidence fails to show that any unfair advantage was taken of defendants. Under these circumstances defendants' unilateral but mistaken belief that the property adjoined a public street and was subject to division into lots affords insufficient ground upon which to deny specific performance. 13 M. J., Mistake and Accident, § 8, p. 141.

The evidence having to do with whether any representations were made by Simpson or any complainants that the property could be divided into lots, fronted on a public street or as to the width of the lane is conflicting. It was the chancellor's province to resolve this conflict and his decision is entitled to the same effect as a jury verdict.

"The evidence before the trial judge on questions of fact is entitled to great weight, and will not be disturbed unless it is plainly wrong or without evidence to support it. § 8-491, Code of Virginia, 1950. Where the conclusion depends on the weight to be given credible testimony, the decree based thereon has the same effect as the verdict of a jury, and the decree will be affirmed although there may be a conflict in the evidence. *Worrie* v. *Boze*, 191 Va. 916, 923, 62 S. E. 2d 876; 1 M. J., Appeal and Error, sections 271, 273, 277 and 278, and cases cited." *Trayer* v. *Bristol Parking*, 198 Va. 595, 597, 95 S. E. 2d 224.

The testimony of Lula Pond that Mrs. Page, an agent of Simpson, told her that "She had some property that I could divide and make some money off" was concededly made before Simpson was employed by complainants and is not binding upon them. When that statement is disregarded as it must be, the evidence clearly sustains the finding that no false statements or representations were made to induce defendants to purchase the property.

There is no merit in the assignments of error which assert that the court should not have decreed specific performance because the property is encumbered by an easement right of way, and because the decree directs conveyence of more property than complainants owned and the description therein differs from that in the tendered deed.

The contract and other evidence convincingly prove that de-

fendants intended to purchase and complainants intended to sell all of the real property that the latter owned within the boundaries stated in the contract, which would be definitely established by survey. The survey and other evidence show that defendants owned the area within the boundaries outlined on the plat, to which ingress and egress is had along the twelve-foot lane, and there is no evidence to the contrary.

The deed dated the 26th day of August, 1958, which was tendered and refused, adequately described the property by metes and bounds though it did not convey the *twelve*-foot lane. However, the description in the deed showed that the land adjoined the *twelve*-foot lane at its southern extremity. The testimony of Lula Pond also convincingly shows that she did not think that the lane constituted a part of the property that she was purchasing though she did erroneously assume that it was a public street and that she could divide the land into lots. The lane was owned by complainants, subject only to a perpetual easement of way and the grant of the property which abutted the lane necessarily conveyed an easement in the lane of ingress and egress appurtenant to the land granted. 6 M. J., Easement, §§ 11 and 12; *Scott* v. *Moore*, 98 Va. 668, 37 S. E. 342.

It is true that the final decree directed that the lane be conveyed to defendants, but because the decree directed conveyance of slightly greater estate in the lane than defendants contracted for is no just ground of complaint by them.

"Specific performance, it is true, is not a matter of absolute or arbitrary right, but is addressed to the reasonable and sound discretion of the court. *First Nat. Bank* v. *Roanoke Oil Co., supra*, 169 Va. at p. 116, 192 S. E. at p. 771. But it is likewise true that the discretion which may be exercised is not an arbitrary or capricious one, but one which is controlled by the established doctrines and settled principles of equity; and, generally, where a contract is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree a specific performance of it as it is for a court of law to give damages for a breach of it. *Bond* v. *Crawford*, 193 Va. 437, 444, 69 S. E. (2d) 470, 475." *Lucy* v. *Zehmer*, 196 Va. 493, 504, 84 S. E. 2d 516.

We find no error in the decree appealed from and it is accordingly affirmed.

*Affirmed.*