## CIRCUIT COURT OF WESTMORELAND COUNTY

Gary E. Stepp

   v.

Outdoor World Corp. and
OW Acquisition Corp.

March 23, 1989

By JUDGE JOSEPH E. SPRUILL, JR.

     Gary E. Stepp (Buyer) has petitioned for specific performance of a contract for the sale of a marina in Westmoreland County, Virginia. Outdoor World Corporation (Seller) has refused to consummate the sale because the survey contemplated by the contract was not completed nor approved by the parties by a "time of the essence" closing date. Eight witnesses testified at a hearing on October 21, 1988, during which twenty-five exhibits were received in evidence. Depositions of additional witnesses were submitted. Nonetheless, there is surprisingly little conflict in the evidence.

     The Court finds the evidence, and the inferences reasonably drawn therefrom, to be substantially as follows. The parties in late 1987 and early 1988 had engaged in preliminary negotiations for the sale and purchase of the marina property. As the parties reached substantial agreement, Buyer selected Paul Scott, a lawyer in Fredericksburg, to represent him in closing. On March 3, 1988, Scott had a telephone conversation with Seller's counsel,

Bruce Morgan, in which they agreed upon the items to be accomplished in preparation for closing, and they divided these tasks between them. Seller, in this conversation, according to Scott, assumed responsibility for the survey. A contract dated March 10, 1988, was subsequently executed by Seller and Buyer in which closing was scheduled for April 1, with an extension to April 15.

Thomas W. Grill, Vice President of Outdoor World, thereafter selected Arthur Whittaker, certified surveyor, to survey the property. Mr. Grill arranged to meet Mr. Whittaker on the site on March 18, 1988, at which time Buyer was present and the boundaries of the property to be sold and the location of a proposed 100-foot easement were designated. On this occasion, discussions about narrowing the 100-foot easement in the area of the swimming pool and gasoline tanks took place between the parties within the hearing of the surveyor. No sense of urgency regarding the completion of the survey was communicated to the surveyor at that time. The surveyor was contacted several times thereafter by Buyer to determine the progress of the survey. During this time, the surveyor was beset by physical ailments and at one stage his equipment failed. There apparently was no contact with the surveyor by Seller at any time after March 18.

On April 15 a preliminary draft of the survey was delivered to Buyer and upon Buyer's request revisions were made and a revised plat was delivered April 18.

On April 5, Buyer was called to a meeting with Seller in Pennsylvania at which Buyer was informed that Seller had serious zoning problems with the campgrounds it was retaining, and that closing could not occur until these problems were resolved. Seller proposed an interim leasing or management arrangement. Seller later agreed that it would not assert these zoning issues as a defense in this case.

On April 12, Seller's counsel, Morgan, wrote Buyer's counsel, Scott, claiming that it was impossible to close by April 15. No mention was made of the survey in this communication. On April 15, Scott replied to Morgan, taking issue with the ostensible zoning problems or the need for any additional permits in order to close, and called for closing on April 21. Scott at this time had received none of the closing documents that were to have been

prepared by Morgan, nor did he ever receive them. Scott felt added time was needed by Seller to prepare for closing.

On April 18, Morgan again wrote Scott repeating his need for additional permits and declining to close. On the same date, Morgan wrote Buyer stating that conditions of closing were not met, no closing would occur, and ordering Buyer to vacate the premises by April 22. In neither of Morgan's April 18 letters was the survey mentioned.

On March 11, the day after the contract between the parties was reached, Seller transferred by deed the property which is the subject of this proceeding to OW Acquisition Corporation. No mention of this was ever communicated by Seller to Buyer, and the Court remains uncertain of the significance of this fact.

*Does the absence of the survey excuse performance by Seller under the circumstances?*

The Court will not place sole responsibility for the survey on Seller. It is not disputed, however, that Seller's on-site representative, Grill, selected the surveyor and arranged the initial meeting with him. Stepp testified that Grill warned him not to rush the surveyor, lest it have an adverse effect. Seller did not overtly delay or obstruct the progress of the survey. Having selected the surveyor, however, Seller must bear at least some responsibility for the fact that the surveyor was unable to produce a plat sooner than he did. At no time prior to April 18, 1988, did Seller inform Buyer that the survey was critical and unless it was in hand and agreed upon prior to April 15, the closing would be aborted.

Any delay in obtaining the survey was clearly not the fault of Buyer who has appeared diligent in every respect in making preparations to close this transaction in accordance with the provisions of the contract.

The survey that was produced by Whittaker on April 18 has been attacked in many ways to show it is not in conformity with local ordinances in one way or another and/or that it is not recordable in its present form. These complaints, in the total context of this case, seem to be of relatively minor substance and are easily remedied without in any way increasing or diminishing the stakes

of either party to the agreement. Indeed, it could scarcely be denied that if both parties wanted to close, these problems could be resolved with a minimum of effort.

It is significant that throughout the case, there has been no contention about the location of the boundaries shown on the plat.

In *Pennsylvania State Shopping Plaza, Inc. v. Olive*, 202 Va. 862 (1962), the Court concluded that the purchaser was trying to avoid its contractual obligations by not making a bona fide effort to comply with the contract, and the Court there held that the purchaser was not excused from its obligations. Similarly, here, though Seller's behavior is more subtle, this Court is unable to find in Seller's activities during this critical period a bona fide effort to prepare for closing in any respect whatever.

Further, the contract gives only the Buyer the right to terminate if the survey is not prepared and agreed upon.

The fact remains, however, that on April 15, the date scheduled for closing, no final survey was available and closing did not occur. Buyer was dependent upon a surveyor selected by Seller. The time between the contract date, March 10, and the closing date, April 15, was, by local standards at least, short, especially for a transaction of this nature, and the surveyor was unable to operate at full speed and efficiency for reasons beyond the control of Buyer. Although the contract makes both parties responsible for the survey costs, Buyer alone paid this expense. Up to the time of closing, Seller claimed other problems would prevent the closing. The survey was available on April 18. Under all of these circumstances, the Court does not feel that the lack of the survey on April 15 should entitle the Seller to abandon his obligations under the contract, especially since Seller must assume at least a substantial part of the responsibility for obtaining the survey.

*Did Seller, by its conduct, waive the "time is of the essence" provision?*

The contract provided for closing on April 1, 1988, and either party had the right to request a fifteen-day extension, "the approval of which shall not be unreasonably

withheld." No further extension would be granted without written consent of both parties, and time was of the essence.

In determining whether time is of the essence of a contract, the intention of the parties is the paramount consideration and such intention may be manifested either by the language of the contract or by the actions of the parties. Here, the language of the contract is plain, but the actions of the parties as the closing date drew near belie the claim now made that time was, in fact, of the essence.

First, there was no follow-up from Seller with the surveyor at any time after the first meeting on March 18. Next, on April 5, Buyer was called to Pennsylvania and told closing would not be possible on April 15 because of zoning and permit problems. (It appears that Seller did not in fact approach the zoning officials of Westmoreland County until some time after April 5.) Then, on April 12, Seller wrote Buyer's counsel that closing on April 15 is "logistically impossible."

For Seller to claim in the days immediately before the scheduled closing date that it would not be possible to close on the scheduled closing date, and then to claim after the closing date that time was of the essence, thereby excusing Seller from performance of its obligations under the contract, is, in the opinion of the Court, untenable.

Seller has advanced several reasons to avoid the contract. Initially, it was because of zoning and permit problems; then the Buyer's threat to sue (made on April 14, when he was unable to establish communications with Seller) was given as the reason; finally, after suit was filed, the lack of a survey was relied upon to excuse performance. Seller's representative, Lee, testified at length and presumably with as much insight as anyone into Seller's reasons for refusing to close. His testimony is less than convincing in stating clearly any reasonable basis for excusing Seller from the contract.

Seller never submitted the needed closing documents to Buyer's counsel for preliminary review, prompting Buyer's counsel to suggest an April 21 closing date. Seller never disclosed essential information about the new record owner which acquired the property the day after the subject contract was signed.

Every contract contains an implied covenant of good faith and fair dealing by all parties in the performance of the agreement. The evidence in this case suggests that Seller has failed to meet this standard. Indeed, the feeling is inescapable to the Court that the Seller at some point in time prior to April 15 changed its position regarding the sale and attempted to contrive a way out.

In view of the foregoing, the Court concludes that the time of the essence provision was waived by Seller's conduct.

*Is the property described with sufficient precision to permit specific performance?*

There has been no dispute about the location of the boundaries of the property as shown on the final Whittaker plat. These boundaries appear to track the drawing prepared by Seller and attached to the March 10 contract. Seller's agent, Grill, with Buyer, pointed out these boundaries to surveyor, and there has been no claim that the boundaries are not correctly designated.

The 100-foot easement was located on the premises, and there has been testimony that it was agreeable to Seller to narrow down this easement. However, this modification to the 100-foot easement was not specifically agreed upon, in the opinion of the Court, and Buyer has indicated a willingness to accept the 100-foot easement, as located, and without modification.

The so-called "shore line easement" is likewise not sufficiently identified to be the subject of a specifically ordered conveyance.

Buyer has indicated his willingness to accept the property described on the final Whittaker survey, without a narrowing of the 100-foot easement, and without the "shore line easement." The property within the survey containing 6.41 acres, more or less, is sufficiently described to be the subject of specific performance.

### Mutuality of Remedy

Seller argues that if specific performance is decreed, Buyer could still, under the terms of the contract, refuse

to purchase the property, and therefore the contract lacks requisite mutuality.

Even though Buyer had the specific option to avoid the contract for a lack of survey, and therefore was not legally bound to performance, the fact that he has initiated this action for specific performance is tantamount to performance and the plea of want of mutuality cannot be made. 4B Michie's Jurisprudence, *Contracts*, Section 28. As stated in *Bond v. Crawford*, 193 Va. 437 (1952), when suit is brought to enforce a unilateral contract, he who has not theretofore been bound will be deemed to have consented to it in writing and to have made the obligations mutual.

## Conclusion

All counsel in this case have represented their clients with skill and thoroughness. No stone appears to have been left unturned, and the Court's task of winnowing the wheat from the straw has not been easy.

This is a suit in equity, and the Court has attempted to objectively appraise the relative rights of the parties and how each would stand should specific performance be either granted or denied. An essential function of equity is to anticipate and prevent injury. Buyer has made substantial commitments in reliance upon the contract. He has done all that could reasonably be expected to fulfill his obligations thereunder. To deny his prayer would result in substantial injury to him. Seller appears not to have acted in complete good faith in all respects. To some significant extent, Seller must bear responsibility for the fact that closing did not occur on April 15. On the other hand, to deny Seller's prayer and grant specific performance would do no more than give Seller the benefit of the contract it bargained for.

Under all the circumstances, the Court is of the opinion that Plaintiff is entitled to specific performance of the March 10, 1988, contract to the extent that Seller shall convey the property therein described exclusive of the shore line easement and subject to the 100-foot easement without modification, as located on the Whittaker survey.